## COLLINS v. HALL.

Supreme Court.  Sussex.  November 6, 1793.

*Bayard's Notebook, 8.**

* This case is also reported in *Miller's Notebook, 14,* and *Wilson's Red Book, 4.*

*Peery* and *Vining* for plaintiff. *Read* and *Bayard* for defendant.

Upon the trial of this cause after several witnesses had been examined upon the part of the plaintiff, one Levin Thompson was offered as a witness upon the same side. *Bayard,* counsel for the defendant, objected that the witness being a Negro was rendered incompetent by the Act of Assembly [2 Del.Laws 887] passed February 3, 1787, the eighth section of which enacts "that no slave manumitted agreeably to the laws of this state, or made free in consequence of this act, or the issue of any such slave, shall be entitled to the privilege of voting at elections, or of being elected or appointed to any office of trust or profit, or to give evidence against any white person, or to enjoy any other rights of a freeman, other than hold property, and to obtain redress in law and equity for any injury to his or her person or property."

It was hereupon proved upon the part of the plaintiff that Thompson was a freeman, that his mother and grandmother had been free, and that they had lived [in] and that he came from the State of Maryland.

The counsel for defendant contended that the witness was still incompetent. He said that slavery being permitted by the laws of the state, it was a necessary consequence that the condition of slaves should be discriminated from that of masters. A plain line was therefore drawn between them by the laws. Their interest and rights were different and frequently opposed; and it was therefore necessary to withhold from slaves some privileges which it was possible in many cases they might exercise without abuse, or perhaps to the advantage of society. He admitted there was nothing in a Negro which naturally disqualified him from giving as credible and instructive evidence as a white person, but the law having bestowed unequal rights and favors upon the whites, had rendered them objects of jealousy and enmity to the blacks and therefore as long as the relation of master and slave was suffered to continue, it was sound and essential policy to communicate to the blacks no rights which might endanger the safety of the whites. That the low and degraded situation of

slaves debased their minds and weakened or effaced those principles which give credibility to the testimony of a witness. Slavery being the general condition of the Negroes, and the connections and society of free blacks consisting principally of slaves, the same policy which would exclude slaves extends to free blacks. Upon such grounds was the eighth section of the Act of '87 made, which embraces, upon a fair construction, the case of this witness. Though his mother and grandmother were free, yet the presumption is that he is the issue of a slave as slavery was the universal state in which Negroes were brought into this country. And though the witness became free by the laws of Maryland, yet he is within the spirit of the Act, as there is the same reason for his exclusion as that of those freed by the laws of this state. It would be absurd and contradictory in practice to admit a freed Negro of Maryland and exclude one of Delaware.

Upon the other side it was argued by *Vining* for the plaintiff that the law should be strictly construed as it was founded on an unjust and absurd principle. The blacks are as competent by nature and should not be rendered less so by law to give evidence than the whites. Becoming free men, the common rights of citizens should be extended to them; and especially there is no reason to withhold from them the right to give evidence. The whites are the judges and by admitting Negroes as witnesses, without danger we increase the means of information and justice. The Court are to decide a question of law, not of policy; and the Act of Assembly does not reach the case of the present witness. It does not appear that he is the issue of a slave, or that, if he is that, he or his ancestors were freed by any law of this state.

READ, C. J. This witness is a Negro, and it has always been the policy of the State to exclude Negroes from the rights of citizenship and from giving evidence where whites are concerned.

There are several instances in which the situation and rights of Negroes and mullattoes are rendered by the laws of the state different from those of whites. By the Act of Assembly contained in the first volume of our laws [1 Body Laws]: page 72, the trial by jury even in capital cases is taken from them; page 77, fornication between blacks and whites is more severely punished than between persons of the same color; page 307, a black cannot be appointed to inflict any corporal punishment upon a white. Article four of the Constitution gives a right to vote only to white freemen. The Act of '87 [2 Del.Laws 887] denies to Negroes the privilege of voting at elections, of being chosen or ap-

pointed to any office of trust or profit, or giving evidence against any white person.

There is no doubt but this man must be taken to be the issue of a slave and, though he were made free by the laws of Maryland, he is clearly within the spirit of the Act of '87. It would be absurd to suppose that the legislature intended to discriminate the capacity of freed black men according to the place from which they came; and that it would bestow rights on those emancipated by the laws of other states which it denied to such as were freed by its own.

ROBINSON, J., of same opinion.

PER CURIAM. Witness is incompetent and must be rejected.